IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


MELISSA FAYE DODDS,                    Case No. 1:14-cv-00782-ST

          **Plaintiff,**                    OPINION AND ORDER

v.

COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION,

          **Defendant.**


**STEWART, Magistrate Judge:**

    Plaintiff, Melissa Dodds ("Dodds"), seeks judicial review of the final decision by the

Social Security Commissioner ("Commissioner") denying her application for Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI

of the Social Security Act ("SSA"), 42 USC §§ 1381-1383f.   This court has jurisdiction to

review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3).   All parties

have consented to allow a Magistrate Judge to enter final orders and judgment in this case in

accordance with FRCP 73 and 28 USC § 636(c).   For the reasons set forth below, that decision

is reversed and remanded for the calculation and payment of benefits.

1 - OPINION AND ORDER

## ADMINISTRATIVE HISTORY

Dodds protectively filed her applications on May 27, 2010.   Tr.   215-37.[1]   Her

applications were denied initially and on reconsideration.   Two hearings were held before

Administrative Law Judge ("ALJ") Phillip J. Simon on June 25 and November 29, 2012.

Tr. 35-71.   The ALJ issued a decision on December 28, 2012, finding Dodds not disabled.

Tr. 15-34.   Therefore, the ALJ's decision is the Commissioner's final decision subject to review

by this court.   20 CFR §§ 416.1481, 422.210.

## BACKGROUND

Born in 1961, Dodds was 50 years old at the time of the hearing.   Tr. 38.   She has

completed a GED and has past relevant work experience as a cashier, checker, fast food worker,

and fast food services manager.   Tr. 26.   Dodds alleges she has been unable to work since

December 31, 2007, due to the combined impairments of pancreatitis, psychosis, Hepatitis C,

ascites, chlamydia, gallbladder surgery removal, and depression.   Tr. 271.

### I.  Medical Records

The extensive medical record is replete with visits by Dodds to the emergency room

("ER") for treatment due to alcohol abuse, mental health issues and physical problems.

On May 3, 2008, Dodds was seen in the ER after cutting herself.   Tr. 446.   She reported

a 10-20 year history of cutting on herself and admitted to daily suicidal thoughts.   *Id.*

On April 29, 2009, Hala Ahmed, M.D., recorded Dodds's admission to continued alcohol

abuse and self-mutilation and diagnosed depression/personality disorder and alcohol dependence.

 Tr. 663.   Noting that Dodds had no insurance and could not afford the counseling she needed,

---

[1] Citations are to the page(s) indicated in the official transcript of the record filed on November 13, 2014 (dockets #12, #13, and #14).

Dr. Ahmed prescribed Fluoxetine.    *Id.*

On June 25, 2009, Dodds was brought by the police to a hospital Emergency Room ("ER") with depression and suicidal ideation due to drinking for the past several days after her fiancé left her.    Tr. 443.    A drug screen was positive for marijuana.    Tr. 444.

On October 18 and 21, 2009, Dodds was seen in the ER with anxiety and vomiting from acute alcohol withdrawal.    Tr. 535, 438.

On November 10, 2009, Dodds was seen in the ER for acute intoxication after drinking "only 30-40 shots of whiskey" that day.    Tr. 435.    She stated that she typically drinks between one-half and one gallon of whiskey daily.    *Id.*

On January 18, 2010, Dodds was seen in the ER for acute alcohol intoxication after making suicide threats on the emergency dispatch line.    Tr. 430, 432.

Dodds began to miss work at her part-time job in March 2010.    Tr. 671-72.    She was seen in the ER on April 10, 2010, with nausea and vomiting after being sober for six days. Tr. 427.    On April 15, 2010, Dodds told Dr. Ahmed that her last drink had been ten days ago. Tr. 1023.    He prescribed Zantac for abdominal pain.

On April 21, 2010, Dodds presented to the ER with numbing and tingling of her abdomen.    Tr. 422.    She had weakness on straight leg raising, walked very slowly, and complained of progressive bilateral lower extremity weakness.    Tr. 424.    Dodds had a cholecystectomy the next day and was discharged two days later.    Tr. 410-11.

On April 27, 2010, Dodds saw Dr. Ahmed for abdominal pain, fatigue, and nausea. Tr. 656.    When she was seen two days later in the ER for abdominal pain, she reported that she had not had alcohol for several weeks.    Tr. 403.

3 - OPINION AND ORDER

On May 2, 2010, Dodds was seen in the ER for severe abdominal pain and fluids leaking from her abdominal incision sites.   Tr. 394.   She was depressed and crying and admitted that she had started drinking heavily again to relieve the pain.   *Id*.   She was admitted for pain management with Oxycontin and morphine; received Lasix, Aldactone, and Inderal for ascites; and was prescribed thiamine, folic acid, Ativan, and Librium for alcohol abuse.   Tr. 396.   On May 6, 2010, Dodds was discharged with the diagnosis of a urinary tract infection - resolved, ascites - resolved, acute pancreatitis secondary to gallstones and alcohol abuse.   Tr. 391.

On May 9, 2010, Dodds was again seen in the ER for abdominal pain.   Tr. 366-70. Describing Dodds as "disruptive," the ER physician found "no emergent medical condition requiring treatment or admission."   Tr. 366. Two days later, Dodds was back in the ER with abdominal pain.   Tr. 383.   She did not remember her cholecystectomy in April 2010, reported drinking "about a half gallon of vodka every day" to treat her pain and was not eating.   *Id*.   The ER physician noted she was "writhing on the stretcher in pain.   She will answer the questions once her pain is controlled, but otherwise not a great historian."   Tr. 383-84.   She was diagnosed with alcohol induced acute pancreatitis, gastroesophageal reflux disease ("GERD"), alcoholic hepatitis, and severe malnutrition.   Tr. 386.   She was discharged after a week (Tr. 1174), but was admitted to the ER the next day (May 19, 2010) with acute abdominal pain, acute pancreatitis, alcoholism, and anemia.   Tr. 378-81.   Dodds returned again on May 21, 2010, with severe abdominal pain from alcohol induced pancreatitis.   Tr. 457.   Two days later she returned again with weakness and fatigue.   Tr. 460.   Her color was poor; she was tearful and very slow; and her lower extremities were swollen.   *Id.*   Three days later, on May 26, 2010, she was admitted due to abdominal pain and an altered mental state and placed on a psychiatric

hold.   Tr. 466.   The next day she filed her DBI and SSI applications at issue here.   On May 30,

2010, she was discharged to the Crisis Resolution Center ("CRC").   Tr. 469.

Dodds was seen in the ER on June 19, 2010, for abdominal pain.   Tr. 643.   She had

stopped taking her medications ten days previously, including Methadone, Ranitidine, Ativan,

folic acid, and thiamine.   *Id.*   She was prescribed Phenergan and Percocet, but did not fill the

prescriptions and left against medical advice.   Tr. 648.   She returned the following day with

abdominal pain and vomiting.   Tr. 648, 729.

On June 23, 2010, Dodds reported to Dr. Ahmed not drinking any alcohol since May 25,

but still had continuing abdominal pain with vomiting and nausea, insomnia, and fatigue.

Tr. 653.   Dr. Ahmed gave her a release to return to work part-time in one week.   Tr. 655.

On August 5, 2010, Dodds saw Bruce Towers, PA-C, at the same clinic as Dr. Ahmed,

for nausea and vomiting.   Tr. 1009.   He prescribed some additional medications.   Tr. 1012.

On August 11, 2010, Dodds completed an Oregon Department of Human Services form

stating she had been clean and sober since May 25, 2010, noting her prior daily use of alcohol,

methamphetamine, and marijuana.   Tr. 305.   She also noted her incarceration for distribution

and driving under the influence.   *Id.*

However, on September 3, 2010, when Dodds was seen in the ER requesting a refill of

her Methadone, she admitted drinking alcohol in the past week.   Tr. 675.   On September 23,

2010, Dodds reported constant pain at 8/10 and that she had run out of medication and drank

alcohol.   Tr. 1005.   PA Towers noted depression, anxiety, fearfulness, inability to focus, and

insomnia.   Tr. 1006.

On October 31, 2010, Dodds was brought by the police to the ER very intoxicated and

threatening to drink herself to death after being fired from her job due to alcohol inebriation. Tr. 685.   She was discharged from the hospital on November 5, 2010.   Tr. 696.

On November 15, 2010, she was again brought to the ER intoxicated.   Tr. 714.   She had a suicide note, stated she was going to kill herself, and was angry, argumentative, and combative. *Id.*   She refused admission to CRC and medications to manage alcohol withdrawal and stated she would return home and drink alcohol.   Tr. 716.   Two days later, she was brought to the ER by ambulance because she was too intoxicated to walk with a blood alcohol level over 300, but she left against medical advice.   Tr. 711-12.

On November 20, 2010, Dodds returned to the ER reporting rape and assault, admitting she had been drinking alcohol, and threatening suicide.   Tr. 708.   She was a very poor historian, essentially refusing to answer questions.   Tr. 739.   Jennifer Wabin, M.D., noted that Dodds was uncooperative, with poor eye contact, a poor mood, an irritable affect, poor insight, ppoor judgment, and poor impulse control, and assessed a Global Assessment of Functioning ("GAF") score of 35.[2]   Tr. 740.   On November 22, Dr. Wabin noted that Dodds stated "that she cannot be helped and she doesn't see any no point in talking."   Tr. 760.   She was discharged on November 24, 2010, with a GAF of 45.   Tr. 752.

On December 6, 2010, Dodds was seen in the ER acutely intoxicated but denied suicidal ideation.   Tr. 754.   She returned intoxicated on December 9 and left against medical advice before mental health personnel could evaluate her.   Tr. 756-59.   The next day Dodds returned to

---

[2] The American Psychiatric Association organizes each psychiatric diagnosis into five levels relating to different aspects of the disorder or disability.   *Diagnostic and Statistical Manual of Mental Disorders* 27-33 (4th ed., text rev., 2000).   Axis V reports the clinician's judgment regarding overall functioning as the GAF score and defines a GAF from 31-40 as: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."   *Id* at 32-33.

the ER intoxicated, stating she wanted to die.   Tr. 769.   On December 20, 2010, she returned to

the ER with abdominal pain and alcohol withdrawal symptoms.   Tr. 772.   She was shaky, weak,

and dizzy, and was admitted for treatment.   Tr. 777.

On January 31, 2011, Dodds was arrested, intoxicated, taken to detox, and then brought

to the ER due to shaking and pain.   Tr. 792.

On February 12, 2011, she returned to the ER with abdominal pain and nausea and

admitted to drinking five half gallons of whiskey per week.   Tr. 794.   The following day she

returned with abdominal pain and vomiting after she had been drinking.   Tr. 797.   The next day,

she was again seen in the ER for abdominal pain and vomiting.   Tr. 812.   Two days later she

returned with convulsions, abdominal pain and visual hallucinations, and was admitted.   Tr. 804,

1116.   However, on February 18, 2011, she left against medical advice.   Tr. 817.

On May 15, 2011, Dodds was seen in the ER, intoxicated and complaining that no one

would help her stop drinking.   Tr. 1110.   She reported that she had been sober for two months,

but resumed drinking when her father died.   *Id.*   She claimed five personalities inside her made

it more difficult to get well.   *Id.*   The physician noted an "rather abrupt change in her entire

demeanor" which Dodds said was a different personality coming out.   Tr. 1111.

On May 17, 2011, Dodds was back in the ER due to depression, suicidal ideation, and

intoxication with a blood alcohol level of 416.   Tr. 823-25.   She was scheduled to start a

rehabilitation program in the morning.   Tr. 823.   On May 20, 2011, Dodds was brought to the

ER by ambulance because of suicidal ideation.   Tr. 828.   She was inebriated, "extremely

disheveled," tangential and confused.   Tr. 832.   She was admitted on a psychiatric hold until an

inpatient bed became available.   Tr. 837.   On May 22, 2011, she refused to speak to the mental

health practitioner.    *Id.*

On June 7, 2011, the police found Dodds intoxicated and sent her to the ER.    Tr. 848.

She was screaming profanities and uncooperative.    *Id.*

On June 16, 2011, Dodds asked PA Towers for Methadone, but was told she could not

have any narcotic given her alcohol abuse.    Tr. 1000.    PA Towers noted Dodds started drinking

again when her son was killed last November, but had been sober for ten days.    *Id.*

On June 22, 2011, Dodds saw PA Towers for severe depression.    Tr. 996.    She reported

that it was extremely difficult for her to meet home, work, or social obligations, and getting

worse.    *Id.*    She was anxious, fearful, compulsive, and fatigued, and hallucinations, poor

concentration, insomnia and suicidal ideation.    *Id.*    Dodds considered cutting herself, and a

voice named "Zach" was telling her to cut off her feet.    *Id.*    PA Towers referred her to the ER,

calling ahead to assure the ER staff that Dodds was not intoxicated.    Tr. 998.    Dodds told ER

that she felt anxious and depressed and had quit drinking alcohol 14 days before.    Tr. 854.    The

next day when Dodds returned, PA Towers noted a constricted affect, auditory hallucinations,

obsessive thoughts, poor insight, poor judgment, and a failure to respond to current treatment.

Tr. 993-94.    On June 27, 2011, Dodds asked PA Towers for a letter requesting morning shift

work only with optional seating in a chair because her foot and ankle edema and bruising made it

too painful to work in the afternoons.    Tr. 990.

On July 1, 2011, PA Towers noted that Dodds had a normal affect but was obsessed with

the pain in her hands and feet.    Tr. 988.    She wanted to cut them off to get rid of the pain, and in

the last month "Zach" is telling her to do it.    *Id.*    On July 7, 2011, PA Towers's mental status

examination of Dodds was normal.    Tr. 984.    On July 8, 2011, Dodds told PA Towers she quit

8 - OPINION AND ORDER

drinking on May 25 and wanted to start Methadone.   Tr. 1013.

On July 13, 2011 (her amended onset date), based on a referral by PA Towers, Dodds had an Adult Biopsychosocial Assessment with Lyn Conner, M.S., Q.M.H.P.   Tr. 863-68.   Dodds reported sexual abuse at age five or six and being raped by five men at age 14.   Tr. 863.   Her abusive ex-husband tried to kill her and was convicted of attempted murder.   *Id.*   She was irritable, scared, had difficulty concentrating, and was self-mutilating.   *Id.*   Dodds had symptoms of paranoia and delusion and reported her son Michael, age seven, had been kidnapped, but admitted she did not have a son named Michael.   *Id.*   She was living at the Gospel Mission and thought that a doll at the Mission might be Michael.   Tr. 863-64.   She had attempted suicide at least five times.   Tr. 864.   Ms. Conner diagnosed post-traumatic stress disorder ("PTSD"), alcohol dependence, and borderline personality disorder, and assessed a GAF of 40.   Tr. 867.   This assessment was endorsed by Mark K. Bradshaw, M.D.   Tr. 868.   Dodds did not return for services.   Tr. 874.

At a visit to refill medications on July 28, 2011, PA Towers again noted chronic problems of bipolar disorder, alcoholic cirrhosis of liver, mononeuritis of upper limb, alcohol dependence, borderline personality disorder, suicide and self-inflicted injury, depression, encephalopathy, and Hepatitis C.   Tr. 969.   He said Dodds was "[n]ot responding to current treatment" and referred her to mental health counseling.   Tr. 971.

On August 16, 2011, PA Towers noted the same chronic problems, adding iron deficiency and acute pancreatitis.   Tr. 964.   He also reported that Dodds "quit drinking in 2010. Last alcoholic drink was two weeks ago."   *Id*.   He noted normal concentration, no anxiety, and normal affect.   Tr. 967.

9 - OPINION AND ORDER

On September 13, 2011, PA Towers noted the same chronic problems and noted that
Dodds reported not having any alcohol in the past year.   Tr. 960.

On October 11, 2011, Dodds saw PA Towers for pain, and tingling in her toes.
Tr. 955-59.   PA Towers noted the same chronic problems.   Tr. 955.

On October 28, 2011, Dodds was taken to the ER by ambulance after an acquaintance
called the police with concerns about her behavior.   Tr. 908.   Dodds told the police she
overdosed on Lamictal and Methadone as a suicide attempt.   *Id.*   Her blood alcohol level was
144, and the urine toxin screen was positive for benzodiazepines.   *Id.*   The physician noted that
14 Lamictal 200 milligram pills were unaccounted for and 36 10 milligram Methadone pills were
missing.   Tr. 909.   A CT scan of the head was normal.   Tr. 1027.   Dodds was described as
agitated and yelling at staff when she did not get what she wanted.   Tr. 1429.   She was
discharged on October 30, 2011, with increased Methadone, Hydrocodone, increased Ativan, and
Omeprzole.   Tr. 1471.

On November 28, 2011, the police took Dodds to the ER after arresting her for driving
while intoxicated with a suspended license.   Tr. 940.   She threatened to stab herself and
reported she had been beaten.   *Id.*   She was aggressive and violent.   Tr. 1328.   Her blood
alcohol level was 289.   Tr. 941.   She was released to jail.   *Id.*

On June 12, 2012, on a referral from the Probation Department, Dodds was screened for
access to Behavioral Health by Jerry Snodgrass, M.S., L.P.C.   Tr. 953-54.   She was scratching
herself until she bled, and her insight and judgment were poor.   Tr. 953.   Dodds could not recall
the names of her medications and had last used alcohol in the past month.   *Id.*   She was easily
distracted, her affect was blunt and her mood depressed.   *Id.*   Snodgrass noted Dodds had a

history of poor compliance with treatment and was seeking SSI and better medications.   Tr. 954.

He noted no deficits in thought processes or content, and Dodds was not interested in long-term

therapy.   *Id.*   Snodgrass gave a "provisional diagnosis" of malingering and alcohol dependence

and assessed a GAF of 40.   *Id.*

      At the June 25, 2012 hearing, counsel reported that Dodds had been sober for six weeks.

Tr. 70.

      On August 5, 2012, Dodds was brought by the police to the ER, clearly intoxicated.

Tr. 1269.   She had physically abused her husband who called the police.   *Id.*   Two days later,

after being released from jail, Dodds was seen in the ER with alcohol withdrawal symptoms and

depression.   Tr. 1243.   She returned to the ER the following day with hypotension and was

referred to CRC.   Tr. 1225.

      On September 4, 2012, Jackson County Mental Health conducted a Comprehensive

Mental Health Assessment.   Tr. 1508-24.   Dodds was disoriented and unsure of the date.

Tr. 1508.   Her reported symptoms included suicidal ideation, depression, anhedonia,

self-mutilation, and anxiety, with rapid breathing, low motivation, and trembling hands.   *Id.*

She was homeless and taking Omeprazole, Seroquel, Lamotrigine, and Fibrolactone.   Tr. 1509.

She had a prescription for Methadone, but was unable to pay for it, and was on probation for

driving under the influence.   Tr. 1510.   She was disorderly and confused; her speech was

hesitant; and she had poor eye contact and a guarded manner.   Tr. 1511.   Dodds had an

abnormal gait and psychomotor retardation.   *Id.*   Her cognition was lethargic with long-term

and short-term memory deficits, and her judgment and insight were severely impaired.   *Id.*

Dodds had a blunted affect, circumstantial thought processes, and was suicidal, with auditory

11 - OPINION AND ORDER

hallucinations.   Tr. 1511-12.   She was described as "autistic or developmentally disabled."

Tr. 1517.   Dodds had not used alcohol since August 7, 2012, but used methamphetamine "lately

once in a while" and marijuana every day until a year ago.   Tr. 1519.   The diagnosis was PTSD,

alcohol dependence with physiological dependence, early full remission, methamphetamine

dependence without physiological dependence, cannabis dependence early full remission,

nicotine dependence with physiological dependence, intellectual deficit, possibly developmental

disability or Asperger's Syndrome, and rule-out borderline personality disorder.   Tr. 1521.   A

GAF of 25 was assessed.   *Id.*

On October 15, 2012, Dodds was seen in the ER, intoxicated and cutting herself.

Tr. 1198.   She was "quite agitated" and threatening staff.   Tr. 1199.   The next day she was

brought to the ER by law enforcement, intoxicated, belligerent and suicidal, and was admitted.

Tr. 1532.   On October 17, Dodds was involuntarily hospitalized on an emergency psychiatric

hold as a danger to herself.   Tr. 1526.   She became extremely sedated and was suspected of

taking pills found in her purse.   Tr. 1615.   On October 18, her GAF was 30.   Tr. 1561.   On

October 19, Dodds was agitated, suicidal, and combative.   Tr. 1618.   She pulled out IV lines,

and had to be restrained.   *Id.*   She continued to be actively suicidal on October 22, but no beds

were available in the secure unit.   Tr. 1642.   The following day, Dodds was admitted to Rogue

Valley Medical Center acute inpatient psychiatric unit.   Tr. 1798-1802.   She was diagnosed

with adjustment disorder with mixed disturbance of emotion and conduct, and mood disorder and

assessed with a GAF of 30.   Tr. 1801.   Two days later, on October 25, 2012, Dodds was

discharged to the CRC on an involuntary psychiatric hold with a GAF of 35.   Tr. 1804, 1858.

On November 14, 2012, Mark Phelps, M.D., diagnosed bipolar disorder, PTSD,

alcoholism, Hepatitis C, and GERD.   Tr. 1860.   On November 26, when discharged, Dodds reported that she was going to jail on December 6, 2012.   Tr. 1887.   She denied being suicidal, and a GAF of 45 was assessed.   *Id.*

On November 29, 2012, Dodds testified at the hearing before the ALJ, and the decision denying her benefits was issued on December 28, 2012.   Not long afterwards on January 8, 2013, Dodds overdosed on Seroquel.   Tr. 2027.   Her blood alcohol level was 125.   *Id.*   She was discharged three days later to the police for violation of her parole.   Tr. 2030.   The physician noted that Dodds was dismissed from his practice six months ago for failure to comply with medical advice and would be tapered off all medications.   *Id.*

On April 18, 2013, Dodds wrote to her attorney from jail.   Tr. 343-44.   She stated that she "tried to live like other people, but it never seems to work.   I do better in jail in some ways. I feel safer.   I'm locked up.   No one can abuse me or hurt me."   Tr. 343.

## II.  <u>Testimony</u>

Dodds did not appear at the first hearing on June 25, 2012, due to lack of transportation. Tr. 67-71.   The ALJ granted a continuance and took her request for a consultative psychological examination under advisement.

At the second hearing on November 29, 2012, Dodds, her counsel, and a vocational expert appeared.   Tr. 35-66.   Dodds moved to amend her alleged onset date to July 13, 2011. Tr. 45.   Dodds testified that she completed her GED, and last worked the prior summer for three to four weeks at Jack in the Box.   Tr. 38-39.   She was fired because she could not keep up. Tr. 39.   She worked in 2009 and 2010, part-time, for a market as a cashier.   *Id.*   She had other workers help her lift heavy things.   Tr. 40.   She stopped working at that job because she needed

too much help.   *Id.*

Dodds worked as a shift manager at Burger King for two years.   Tr. 41.   She was fired from the job when her parents' house was burglarized in August 2007, and Dodds went to take care of them.   Tr. 42.

Dodds was taking Methadone when working at Jack in the Box.   Tr. 46.   Although she no longer takes Methadone and had been sober about 30 days, she could not work eight hours a day, five days a week, because she "can't stand on my feet that long."   Tr. 47.   "Just being around a lot of people is very scary.   My feet and ankles are covered in bruises from the (INAUDIBLE) I caused it.   I can't change that.   I wish I could."   Tr. 47-48.   She stated that her feet and ankles are very painful, and she cannot walk very far.   Tr. 48.   She can stand for about five minutes and walk about one to two blocks at a slow pace.   *Id.*

Dodds testified she gets very scared around people, particularly males, for fear of being physically harmed.   *Id.*   She was raped by five men in tenth grade and was sent to the state mental hospital a few years later.   *Id.*   Dodds said she had to be strong for her parents when their home was burglarized, and they are her only friends.   Tr. 49.   Her parents are both terminally ill.   *Id.*   The burglary "broke the whole family."   Tr. 50.   Asked whether she could do the job at Burger King today, Dodds said: "No.   There's this girl (INAUDIBLE) her name is China because she's, she's China and she's broken and there is no Band-Aid big enough to fit it." *Id*.   Dodds testified that "[e]verything is broken in me.   My heart's been broken too much.   I can't bear it no more.   I've been trying for so long and getting beat up by guys all the time, being raped, just everything.   I can't do it no more."   Tr. 50-51.

Dodds had not used Methadone in six months and no longer has pancreatitis.   Tr. 52-53.

However, she believes her mental health is getting worse, and has trouble concentrating and remembering. Tr. 53. She could not do a consistent activity for eight hours. Tr. 53-54. She made a bead bracelet that should have taken 15 minutes but took her two days. Tr. 54. Dodds believes that she would miss more than two days of work per month due to mental health issues. Tr. 55. In an eight-hour work period, she would be unable to concentrate 50% of the time. Tr. 56. Regarding her mental health, she explained:

> What's done is done. The only thing that can change is maybe someday my mind – I don't know. I take a lot of psych drugs and I don't know what else can change me. I just know I'm tired of being sad. I'm tired of people trying to take advantage of me. I'm tired of being abused. It's been going on since I was 14 and I'm tired.

Tr. 56-57.

Dodds has pain in her hands, feet, and abdomen. Tr. 57. She drops things. Tr. 58. She can use her hands for 45 to 60 minutes before requiring a 15 minute break. Tr. 59. She walks very carefully and had fallen three times in the last few months. *Id.*

The ALJ declined Dodds's request for a psychological evaluation because she had only been sober for 30 days. Tr. 65. The ALJ also declined Dodds's request to amend her alleged onset date to July 13, 2011. Tr. 18.

## STANDARDS

The initial burden of proof rests on the claimant to establish disability. *Molina v. Astrue*, 674 F3d 1104, 1110 (9th Cir 2012). To meet this burden, a claimant must demonstrate her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 USC §§ 423(d)(1)(A). The ALJ must develop the

record when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *McLeod v. Astrue*, 640 F3d 881, 885 (9th Cir 2011), quoting *Mayes v. Massanari,* 276 F3d 453, 459–60 (9th Cir 2001).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 USC § 405(g). *See also Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F3d 1157, 1161 (9th Cir 2012). Substantial evidence is "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Molina*, 674 F3d at 1110-11, quoting *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F3d 685, 690 (9th Cir 2009). It is "more than a mere scintilla [of evidence] but less than a preponderance." *Id,* citing *Valentine*, 574 F3d at 690.

The ALJ is responsible for determining credibility, resolving conflicts in the medical evidence, and resolving ambiguities. *Vasquez v. Astrue*, 572 F3d 586, 591 (9th Cir 2009). The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision. *Ryan v. Comm'r of Soc. Sec.*, 528 F3d 1194, 1198 (9th Cir 2008). Even when the evidence is susceptible to more than one rational interpretation, the court must uphold the Commissioner's findings if they are supported by inferences reasonably drawn from the record. *Ludwig v. Astrue*, 681 F3d 1047, 1051 (9th Cir 2012). The court may not substitute its judgment for that of the Commissioner. *Ryan*, 528 F3d at 1205, citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007).

///

///

///

16 - OPINION AND ORDER

## DISABILITY ANALYSIS

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.    20 CFR §§ 404.1520, 416.920; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity. If so, the claimant is not disabled.    20 CFR §§ 404.1520(a)(4)(i) & (b), 416.920(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.    20 CFR §§ 404.1520(a)(4)(ii) & (c), 416.909, 416.920(a)(4)(ii) & (c).    Absent a severe impairment, the claimant is not disabled.    Id.

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.    20 CFR §§ 404.1520(a)(4)(iii) & (d), 416.920(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 ("Listing of Impairments").    If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC").    The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments.    20 CFR §§ 404.1520(e), 416.920(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).    "A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent schedule."    SSR 96-8p, at *1.    In other words, the Social Security Act does not require complete incapacity to be disabled.    *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F3d

17 - OPINION AND ORDER

1228, 1234-35 (9th Cir 2011), citing *Fair v. Bowen,* 885 F2d 597, 603 (9th Cir 1989).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work.   20 CFR §§ 404.1520(a)(4)(iv) & (e), 416.920(a)(4)(iv) & (e).   If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy.   20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g); *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099.

The initial burden of establishing disability rests upon the claimant.   *Tackett*, 180 F3d at 1098.   If the process reaches step five, the burden shifts to the Commissioner to identify jobs in the national economy within the claimant's RFC.   *Id.*   The Commissioner may satisfy this burden through the testimony of a vocational expert or by reference to the Medical–Vocational Guidelines set forth at 20 CFR Part 404, Subpart P, Appendix 2.   If the Commissioner meets this burden, then the claimant is not disabled.   20 CFR §§ 404.1520(a)(4)(v) & (g), 416.920(a)(4)(v) & (g), 416.960(c).

## ALJ's FINDINGS

At step one the ALJ found that Dodds has not engaged in substantial gainful activity since her alleged onset date of December 31, 2007, and met the insured requirements of the Act through December 31, 2014.   Tr. 21.

At step two the ALJ found that Dodds had the severe impairments of Hepatitis C with cirrhosis, chronic pancreatitis, ascites, chronic thrombocytopenia, esophageal varices and status post cholecystectomy, depression, alcohol dependence and methamphetamine dependence, an adjustment disorder with mixed disturbance of emotions and conduct, in addition to a mood disorder not otherwise specified.   *Id.*

At step three the ALJ concluded that Dodds's impairments do meet or equal the criteria for a listed impairment, specifically Listing 12.09 as evaluated under 12.04.   Tr. 22.   However, the ALJ found that, factoring out the impact of her substance abuse, Dodds had the RFC to push, pull, lift and carry 20 pounds occasionally and ten pounds frequently, and sit, stand, and walk without significant limitation, she is precluded from climbing ropes, ladders, and scaffolds, and must avoid workplace hazards such as unprotected heights and dangerous machinery.   Tr. 23.

At step four the ALJ concluded that, factoring out substance abuse, Dodds was able to perform her past relevant work.   Tr. 26.

## DISCUSSION

Dodds contends the ALJ erred by:   (1) finding substance abuse a contributing factor material to the determination of disability based on the ALJ's opinion rather than a medical opinion; (2) improperly denying her request for a psychological evaluation to assess her mental functional limitations when clean and sober; (3) improperly rejecting the opinions of her treating and examining providers; (4) improperly rejecting her symptom testimony; (5) failing to consider the combined effects of her impairments; and (6) failing to find her disabled under the "grid" Rule 201.09.   Because the first three assertions are dispositive, the court need not address the remaining arguments.

## I.  Substance Abuse

The payment of benefits is prohibited when drug and alcohol use is a material factor in a claimant's disability.   42 USC § 423(d)(2)(C) & § 1382c(a)(3)(J); 20 CFR § 416.935. An ALJ must conduct a drug and alcoholism analysis ("DAA analysis") by determining which of the claimant's disabling limitations would remain if the claimant stopped using drugs or alcohol.

19 - OPINION AND ORDER

20 CFR § 404.1535(b).   If the remaining limitations would not be disabling, then the claimant's substance abuse is material and benefits must be denied.   *Id*; *Parra*, 481 F3d at 745.

The claimant bears the burden of proving that substance abuse is not a material contributing factor to the alleged disability.   *Id*.   When it is not possible to separate mental restrictions and limitations imposed by the DAA and the mental disorders shown by the evidence, then a finding of "not material" is appropriate.   Emergency Teletype on DAA, August 30, 1996, Answer 29.

The ALJ found that Dodds was not disabled based on the "absence of medical and psychiatric treatment" and "apparent improvement in her symptoms" during two time periods when she was not drinking alcohol:   (1) from May until October 2010 and (2) from June until October 2011.   Tr. 23-25.   Although the medical record does reveal periods of sobriety or reduced alcohol consumption, the time periods are shorter than found by the ALJ and include reports of physical and mental impairments affecting Dodds's ability to function.

With respect to the period of sobriety from May to October 2010, the ALJ found that Dodds "medical treatment was substantially reduced and largely focused on residual abdominal symptoms resulting from her alcohol abuse, which appears to resolve over time, as well as pain complaints of unclear origin."   Tr. 24, citing Tr. 1002-020.   When Dodds was seen in the ER on June 19, 2010, for acute pancreatitis, she reported that she last drank on May 25 and that her "psychiatric problems [were] somewhat improved."   Tr. 643-46.   However, when Dodds presented at the ER on September 3, 2010, she admitted drinking in the past week, which would have been in late August.   Tr. 675.   She was seen again in the ER on September 23, 2010, when she admitted drinking alcohol.   Tr. 1005.   Thus, the record indicates that Dodds was sober for

about three months from May 25 to late August 2010, or about two months less than the time period stated by the ALJ.

During that time period, Dodds reported that her "psychiatric problems [were] somewhat improved" on June 19 (Tr. 644) and received a normal psychological assessment on August 5, 2010. Tr. 1010. However, she started drinking again within a few weeks and by September 23, 2010, was back in the ER exhibiting anxiety, depression, fearfulness, inability to focus and insomnia. Tr. 1006. By October 31, 2010, she was threatening to drink herself to death. Tr. 685. Therefore, she was unable to function without impairment for only a short time.

Furthermore, it is far from clear that Dodds's abdominal pain resolved during that time period. She complained of abdominal pain in the ER on June 20 (Tr. 729) and to Dr. Ahmed on June 23 (Tr. 653) which had not improved after her cholecystectomy on April 22, 2010. On August 5, 2010, Dodds presented with nausea and vomiting, and PA Towers assessed her with "chronic abdominal pain – mixed etiology with Hepatitis C (never treated) and chronic gastritis." Tr. 1009-011. Dodds was still reporting abdominal pain in December 2010 and February 2011. Tr. 772, 794, 797, 812, 804.

The ALJ also overstated the second time period of sobriety as lasting from June to October 2011. Dodds was intoxicated on June 7 (Tr. 848), but sober by June 16, 2011, when PA Towers referred her to ER. Tr. 996. However, on August 16, 2011, Dodds reported to PA Towers that her "[l]ast alcoholic drink was two weeks ago." Tr. 964. Thus, the medical records reveal that Dodds was sober, at best, from June 7 through the end of July 2011.

During this time period, Dodds continued to suffer from mental impairments. On June 23, 2011, PA Towers noted depression and anxiety and that she was "not responding to

current treatment."   Tr. 994.   On July 1, 2011, PA Towers wrote Dodds was obsessed with the

pain in her hands and feet, and heard a voice telling her to cut them off to stop the pain.   Tr. 988.

According to the psychological assessment on July 13, 2011, Dodds was irritable, scared, had

difficulty concentrating, and was self-mutilating, with symptoms of paranoia and delusion.

Tr. 863.   Ms. Conner diagnosed PTSD, alcohol and methamphetamine dependence, and

borderline personality disorder, and assessed a GAF of 40.   Tr. 867.   Ms. Conner concluded,

and Dr. Bradshaw concurred, that Dodd was "not able to work at this time, due to abuse of

alcohol and medical issues."   Tr. 867.   The treatment plan was to stabilize her mood because

she was "unable to work due to mental health issues, medical issues and her alcoholism.   She

would like a referral to Employment Works to help her find a job.   At this time, she is not stable

enough to do the referral right away."   Tr. 868.   On July 28, 2011, PA Towers noted anxiety and

depression.   Tr. 970.   He said Dodds was not responding to treatment and referred her to mental

health counseling.   Tr. 971-72.   On October 28, 2011, Dodds was taken to the ER after a suicide

attempt.   Tr. 908.

   The ALJ also relied on a "substantial treatment gap between November 2011 and August

2012, when Dodds "was on probation for alcohol related offenses."   Tr. 24.   Due to that gap, he

found it "reasonable to assume that [Dodds] attempted to abide by the terms of her probation,

which included that she not consume alcohol or other drugs."   *Id*.   During that time period, he

noted "only one single medical record, a June 2012 psychiatric evaluation" in which Dodds "was

actually diagnosed as malingering."   *Id.*

   The record contains evidence from which the ALJ may reasonably infer Dodds sought

less medical care when sober.   Dodds is clearly incapable of working when she is so intoxicated

or drugged that she requires medical treatment.    However, nothing in the record supports the

ALJ's conclusion that Dodds is capable of engaging in substantial gainful activity when she is

sober based on the lack of medical treatment for three months in 2010 and two months in 2011.

The absence of medical evidence is not substantial evidence.    *See Lauer v. Apfel*, 245 F3d 700

(8th Cir 2001) (a physician's silence on an issue does not satisfy the Commissioner's burden to

support his decision with substantial evidence).    Although Dodds did not require treatment in

the ER for intoxication during those two short periods of sobriety, the medical record reveals that

her medical impairments, both physical and mental, persisted notwithstanding her expected

improvement when not drinking.    And both of those periods of sobriety ended with episodes of

suicide attempts by overdrinking, further casting doubt on Dodds's mental stability when sober.

How long a period of sobriety is necessary to ascertain Dodds's ability to work an

eight-hour day for five days a week is unknown.    Although the ALJ relied on two short periods

of sobriety to support his finding, he rejected Dodds's request for a consultative psychological

examination because Dodds had only been sober for 30 days and "hasn't had a sustained full

remission.    Therefore, the results might not be reflective of her true capacity at this point."

Tr. 65.    It is inconsistent for the ALJ to assert that 30 days is too short a period to reflect

Dodds's capacity when sober, yet infer that Dodds can maintain substantial gainful activity from

a two or three month period of not drinking.    Rather than rely on his own misreading of the

medical records, the ALJ should have granted Dodds's request for a consultative psychological

examination.

On this record, the ALJ's assertion that Dodds retained the ability to perform substantial

gainful activity during periods of sobriety is not supported by the record.

23 - OPINION AND ORDER

## II.  Treating and Examining Providers

Disability opinions are reserved for the Commissioner.   20 CFR §§ 404.1527(e)(1), 416.927(e)(1).   If no conflict arises between medical source opinions, the ALJ generally must accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).   The ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician.   *Orn v. Astrue,* 495 F3d 625, 632 (9th Cir 2007).   If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons.   *Id* (treating physician); *Widmark v. Barnhart,* 454 F3d 1063, 1067 (9th Cir 2006) (examining physician). Even if one physician is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. *Orn*, 495 F3d at 632; *Widmark,* 454 F3d at 1066.   The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial evidence to reject the opinion of a treating or examining physician.   *Widmark,* 454 F3d at 1066 n 2.   The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings."   *Bayliss v. Barnhart*, 427 F3d 1211, 1216 (9th Cir 2005).

The ALJ made one reference to the July 2011 psychological assessment by Ms. Conner and Dr. Bradshaw, noting that Dodds had "been diagnosed with other psychiatric conditions, such as bipolar disorder, as well as post-traumatic stress disorder."   Tr. 21.   However, the ALJ rejected that opinion, stating the "diagnoses were not consistently offered" and "appear to have been rendered by social workers and other non-acceptable medical sources . . . and medical doctors with less mental health training and expertise."   Tr. 21-22.

24 - OPINION AND ORDER

The Commissioner argues that the ALJ properly relied on the treatment record and the findings by the reviewing State agency psychological and medical consultants who opined on January 28, 2011, that Dodds's psychiatric symptoms and limitations would not equal a Listing severity without the alcohol abuse.   Tr. 23, 102.   The ALJ relied on those reviewing consultants because "their opinions are consistent with, and well supported by, the medical record. Moreover, their opinions are effectively uncontroverted."   Tr. 23.

Contrary to the ALJ's finding, the reviewing consultants' opinions are controverted. Dr. Bradshaw and Ms. Conner conducted an assessment of Dodds as employees of Options for Southern Oregon, a non-profit corporation which provides the Community Mental Health Program for Josephine County, on referral from Dodds's primary care provider.   The ALJ wrongly asserted that Ms. Conner and Dr. Bradshaw had "less mental health training and expertise" than the reviewing consultants.   Moreover, their July 2011 Assessment is consistent with the September 2012 Jackson County Mental Health Comprehensive Mental Health Assessment.   Tr. 1508-24.

Thus, the ALJ erred by failing to offer specific and legitimate reasons, let alone clear and convincing reasons, to reject the July 2011 Adult Biopsychosocial Assessment.

## **REMAND**

The decision whether to remand for further proceedings or for immediate payment of benefits generally turns on the likely utility of further proceedings.   *Harman v. Apfel*, 211 F3d 1172, 1179 (9th Cir 2000).   When "the record has been fully developed and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits."   *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004).

25 - OPINION AND ORDER

The decision whether to remand this case for further proceedings or for the payment of benefits is a decision within the discretion of the court.   *Harman*, 211 F3d 1178.   The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed."   *Id*.   The court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting . . . evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.*

The second and third prongs of the test often merge into a single question:   Whether the ALJ would have to award benefits if the case were remanded for further proceedings.   *Id* at 1178 n 2.

As discussed above, the ALJ erred when he rejected the opinions of Dr. Bradshaw and Ms. Conner.   If credited, those opinions establish that Dodds is disabled, factoring out her substance abuse, due to her mental impairments either alone or when combined with her multiple physical medical impairments.   Based on the medical record, this court concludes that Dodds is disabled and that no useful purpose would be served by a remand of this matter for further proceedings.

///

///

///

///

26 - OPINION AND ORDER

## ORDER

For these reasons, the decision of the Commissioner is REVERSED and REMANDED pursuant to Sentence Four, 42 USC § 405(g) for the immediate calculation and payment of benefits to Dodds.

Dated this 20th day of July, 2015.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge